No. 03-673

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 177

IN THE MATTER OF R.L.H.,

A YOUTH UNDER THE AGE OF EIGHTEEN.

APPEAL FROM:     District Court of the Fourth Judicial District,
                 In and for the County of Missoula, Cause No. DJ-01-24,
                 The Honorable Ed McLean, Judge presiding.

COUNSEL OF RECORD:

          For Appellant:

          Margaret L. Borg, Chief Public Defender, Missoula, Montana

          For Respondent:

          Hon. Mike McGrath, Attorney General; Jim Wheelis,
          Assistant Attorney General, Helena, Montana

          Fred Van Valkenburg, Missoula County Attorney; Leslie Halligan, Deputy
          County Attorney, Missoula, Montana

                              Submitted on Briefs:  October 26, 2004

                                        Decided:  July 19, 2005

Filed:

          _____
                              Clerk

Justice John Warner delivered the Opinion of the Court.

¶1     R.L.H., a juvenile female, appeals from an order entered July 3, 2003, in the Youth Court for the Fourth Judicial District, Missoula County, finding her a delinquent youth and committing her to the custody of the Department of Corrections for placement at Riverside Correctional Center.   R.L.H. was 16 years old at the time the Order was entered. We affirm the commitment to Riverside Correctional Center based on possession of methamphetamine. We reverse and remand for dismissal of the charges of possession of opiates, a felony, and possession of marijuana, a misdemeanor.

¶2     We address the following issues on appeal:

¶3     1.  Did the Youth Court err in denying R.L.H.'s Motion to Dismiss the petition alleging possession of methamphetamine based on a positive uranalysis test?

¶4     2.  Did the Youth Court err in admitting into evidence R.L.H.'s admission that she used methamphetamine on or about December 19, 2002?

## I. FACTUAL AND PROCEDURAL BACKGROUND

¶5     R.L.H. first entered the juvenile justice system in March of 2001,  at age 13, when she was charged with misdemeanor theft, obstructing an officer, disorderly conduct, and habitual truancy.  Pursuant to a consent decree entered August 16, 2001, R.L.H. was placed in the Florence Crittendon Group Home.

¶6     On April 9, 2002, R.L.H. was adjudicated a delinquent youth, based on two misdemeanor assaults.  She was put on probation until age 18, and placed at Children's Comprehensive Services in Butte.  R.L.H. completed treatment and was released on probation to the care of her grandparents.

2

¶7     On September 12, 2002, R.L.H. was found to have violated the terms of her probation by using and possessing marijuana.  She was again found to be a delinquent youth.  Her probation was reinstated and she was placed in shelter care.

¶8     On December 23, 2002, the Missoula County Attorney filed a Second Petition to Revoke R.L.H.'s probation, alleging she ran away from shelter care and tested positive, via a urinalysis, on December 19, 2002, for illegal drugs, including methamphetamine, opiates and marijuana.  On January 2, 2003, R.L.H. appeared in Youth Court with her counsel and after acknowledging that she was aware of all of her rights, including the right to remain silent, she admitted using methamphetamine on or about December 19, 2002.  The admission was made based on the understanding that the County Attorney would recommend a treatment program as the disposition.  The County Attorney did as agreed, and R.L.H. was ordered to treatment at Shodair Hospital.

¶9     At Shodair, R.L.H. was diagnosed with alcohol and cannabis dependency, methamphetamine abuse, and bipolar disorder.  The Shodair team recommended residential care as R.L.H. refused to remain in less restrictive treatment programs.  R.L.H. was treated at Shodair from January 3, 2003, to February 14, 2003, when she ran away.

¶10    On March 5, 2003, the Missoula County Attorney filed a Third Petition to Revoke. The petition alleged R.L.H. committed the offenses of felony possession of methamphetamine, felony possession of opiates, and misdemeanor possession of marijuana. In order for her to be placed in a youth detention facility, it was necessary to secure a determination that R.L.H. was guilty of an offense that would be a felony crime if committed by an adult.  Sections 41-5-341(1); 41-5-206(1)(b)(x), MCA.  The charges in the petition

were based on the uranalysis test of December 19, 2002, and on the admissions made on January 2, 2003, in open court.

¶11    R.L.H. denied the allegations of the Third Petition to Revoke and filed a Motion to Dismiss, claiming possession by ingestion or consumption was insufficient to prove possession of a dangerous drug under Montana law.  The Youth Court denied the motion.

¶12    The petition was set for a jury trial.  R.L.H. filed a motion to exclude evidence, to prevent the introduction of the admissions she made on January 2, 2003.  The motion to exclude was denied.

¶13    At the close of the evidence at the jury trial, R.L.H. moved for a directed verdict, again claiming that ingestion of illegal drugs was insufficient to prove possession.  This motion was likewise denied.

¶14    A jury found R.L.H. guilty of all three charges in the Third Petition to Revoke.  On July 3, 2003, R.L.H. appeared with counsel for disposition.  The Youth Court  committed R.L.H. to the custody of the Department of Corrections for placement at Riverside Correctional Center, a secure youth detention facility.  This appeal followed.

## II. STANDARD OF REVIEW

¶15    The denial of a motion to dismiss a formal petition in Youth Court is a matter of law which we review *de novo,* determining only whether the court correctly interpreted the law. *State v. R.B. "J" C*., 2004 MT 254, ¶ 7, 323 Mont. 62, ¶ 7,  97 P.3d 1116, ¶ 7.

¶16    We treat a motion to exclude testimony as a motion to suppress.  *State v. Baldwin,* 2003 MT 346, ¶ 11, 318 Mont. 489, ¶ 11, 81 P.3d 488, ¶ 11.  Our standard of review for a Youth Court's denial of a motion to suppress is whether the court's findings of fact are

4

clearly erroneous, and whether those findings are correctly applied as a matter of law. *Baldwin,* ¶ 11.

## III. DISCUSSION

### ISSUE ONE

¶17 **Did the Youth Court err in denying R.L.H.'s Motion to Dismiss the petition alleging possession of methamphetamine based on a positive uranalysis test?**

¶18 A person commits the offense of criminal possession of dangerous drugs if the person possesses any dangerous drug defined in § 50-32-101(6), MCA. Section 45-9-102, MCA. Methamphetamine is a dangerous drug. Possession is the knowing control of anything for a sufficient time to be able to terminate control. Section 45-2-101(58), MCA. Possession can be either actual or constructive. *State v. Neely* (1993), 261 Mont. 369, 374, 862 P.2d 1109, 1112. Constructive possession may be imputed when the substance is subject to the defendant's dominion and control. *Neely*, 261 Mont. at 374, 862 P.2d at 1112. Whether constructive possession can be proved by a positive urinalysis is an issue of first impression in Montana.

¶19 R.L.H. argues that she was not in "possession" of dangerous drugs because once the drugs were in her system, she did not have dominion or control over them. Accordingly, R.L.H. urges this Court to follow those state courts that have held that once a person injects or ingests an illegal substance into their body and it is assimilated into the blood stream, they cease to possess the substance because they lose dominion and control over it. *See, e.g., State v. Flinchpaugh* (Kan. 1983), 659 P.2d 208; *People v. Spann* (Cal. App. 1986), 232 Cal. Rptr. 31; *State v. Downes* (Or. App. 1977), 572 P.2d 1328.

5

¶20 In the alternative, R.L.H. argues that if this Court concludes that the presence of an illegal substance in a person's blood or urine constitutes circumstantial evidence of prior possession, such circumstance is not sufficient to prove guilt beyond a reasonable doubt in criminal proceedings because it is impossible to determine from a urinalysis or blood test when or how the substance entered the body and whether it was taken knowingly. *Flinchpaugh,* 659 P.2d at 212.

¶21 R.L.H. next argues that if the Montana Legislature had intended to criminalize possession of dangerous drugs by ingestion or consumption, it would have explicitly done so. Since this language is absent from both the statutory language criminalizing the possession of dangerous drugs found in § 45-9-102, MCA, and the statutory definition of "possession" found in § 45-2-101(58), MCA, R.L.H. argues that the Montana Legislature did not contemplate possession by ingestion. R.L.H. notes that Senate Bill No. 439, proposing to include "consumption by any means" in the statutory definition of possession, was defeated in the 2003 legislative session. She argues that this is further proof that the Legislature did not intend to criminalize possession by ingestion. *See State v. Schroeder* (S.D. 2004), 674 N.W.2d 827, 831 (holding a positive urinalysis is sufficient to support a conviction for possession where the legislature amended the statute governing the definition of a controlled substance to include substances once they have been absorbed in the body).

¶22 In jurisdictions which have enacted separate statutes that criminalize both the "use" and the "possession" of dangerous drugs, courts have held that evidence of use, such as a positive urinalysis, cannot also be used to support a separate charge for possession. *See, e.g., Spann,* 232 Cal. Rptr. at 35; *Downes,* 572 P.2d at 1330. However, Montana has not adopted

6

statutes creating such separate offenses, and the reasoning of such cases does not apply.

¶23    We do conclude that once a substance is ingested and then assimilated into the bloodstream, the person who ingested it does cease to exercise dominion and control over the substance. *See, e.g., Spann*, 232 Cal. Rptr. at 32; *Downes,* 572 P.2d at 1330; *Flinchpaugh,* 659 P.2d at 210*; State v. Thronsen* (Alaska App. 1991), 809 P.2d 941, 942. However, like many of those jurisdictions which have addressed this issue, we also conclude that the presence of an illegal substance in the body constitutes circumstantial evidence of prior possession of that substance.  The theory is that in order to have ingested the drug the person had to have possessed it, if even for a short period of time.  *See, e.g., United States v. Blackston* (3d Cir. 1991), 940 F.2d 877, 887.  We also agree with those courts that have reached the logical conclusion that loss or destruction of evidence by ingestion prior to arrest should not be allowed to automatically defeat a possession charge.  *See, e.g., People v. Palaschak* (Ca. 1995), 893 P.2d 717, 720.

¶24    In Montana, to constitute an offense, the possession of a dangerous drug must be knowingly.  Sections 45-9-102; 45-2-103(1), MCA.  In order to prove that the possession of a dangerous drug is with knowledge, it is necessary for the state to present evidence that the person charged with the offense was aware that they possessed the dangerous drug, or that such person was aware of a high probability that such substance is a dangerous drug. Section 45-2-101(34), MCA.  Further, to establish criminal possession of a dangerous drug, the state must present evidence that such possession was voluntary.  Section 45-2-202, MCA.  Based on Montana's statutory definitions we conclude that while the presence of a dangerous drug in one's body constitutes a circumstance that indicates prior possession of

7

that substance, it is insufficient, standing alone, to sustain a conviction for possession of dangerous drugs. This is so because without more than proof that a person had a dangerous drug in their system, there is no evidence to establish that such drug was knowingly and voluntarily ingested.

¶25 However, where there exists sufficient direct or circumstantial evidence of past possession, over and above evidence of mere use or ingestion, that is sufficient to sustain a conviction for possession at the time of ingestion, rather than possession at the time of arrest. *See Palaschak*, 893 P.2d at 720; *Blackston*, 940 F.2d at 891 (holding where the defendant had three positive urinalyses plus admitted drug use, it was sufficient to establish possession).

¶26 We conclude that the presence of a controlled substance in a person's blood or urine constitutes sufficient circumstantial evidence to prove prior possession beyond a reasonable doubt only when accompanied by other corroborating evidence of knowing and voluntary possession, such as an admission of drug use. *See Flinchpaugh*, 659 P.2d at 212; *Blackston,* 940 F.2d at 891; *State v. Lewis* (Minn. Ct. App. 1986), 394 N.W.2d 212, 217.

¶27 In this case, R.L.H. was charged with possession of dangerous drugs "on or about" December 19, 2002. She does not dispute that she was charged with possession prior to ingesting the drugs. Charging R.L.H. with possession on or about December 19, 2002, is sufficient to give her notice that she was being charged with possession at the time she ingested the drugs that were found to be in her system on December 16, 2002.

¶28 A minute entry states that R.L.H. appeared with her counsel in Youth Court on January 2, 2003, and admitted the allegations of the Second Petition to Revoke. She also

8

signed a document entitled Juvenile Acknowledgment of Rights wherein she admitted the allegations of that petition. Such petition charged that "on December 16, 2002, [R.L.H.] tested positive for, and admitted to using, illegal drugs, specifically methamphetamine." This admission, presented to the jury at trial, provides direct evidence that R.L.H. knowingly and voluntarily possessed the dangerous drug methamphetamine, as charged. Thus, the State presented sufficient direct evidence to corroborate the circumstantial evidence of the urinalysis test which was positive for methamphetamine.

¶29    However, as the State concedes, R.L.H. made no admission that she used opiates or marijuana. Thus, there was no corroborating evidence to support the uranalysis test which was positive for these substances. The determination that R.L.H. committed the offenses of felony possession of opiates and misdemeanor possession of marijuana must be reversed and the charges dismissed.

## ISSUE TWO

¶30    **Did the Youth Court err in admitting into evidence R.L.H.'s admission that she used methamphetamine on or about December 19, 2002?**

¶31    R.L.H. argues that the Youth Court erred in not excluding her admission entered on January 2, 2003, because she was not explicitly advised that the admission could be used against her in subsequent criminal proceedings.

¶32    R.L.H's admission was indeed a self-incriminating statement, which she could not have been compelled to make. However, the Fifth Amendment of the United States Constitution, and Article II, Section 25, of the Montana Constitution speak of "compulsion." If the State has not compelled a person to respond, the privilege against self-incrimination

9

does not attach. A person claiming the benefit of the privilege must invoke it. A person may lose the benefit of the privilege without making a knowing and intelligent waiver if she simply fails to assert it. *State v. Fuller* (1996), 276 Mont. 155, 160, 915 P.2d 809, 812. Thus, we will not reverse the Youth Court's disposition simply because R.L.H. was not explicitly advised that her admission of methamphetamine use could be later used against her should she violate the terms of her continued probation. If the statement was not compelled, that is, if it was voluntary, it could properly be used at the trial on the subsequent charge of possession of methamphetamine contained in the Third Petition to Revoke R.L.H's probation.

¶33 The substance of R.L.H's claim is that her admission was not voluntary because she was placed in a position where she was compelled to admit the offense. R.L.H. argues that this Court should rely on the decisions of those state courts which have held that incriminating testimony given by a probationer at a probation revocation hearing is inadmissible, except for purposes of impeachment or rebuttal, in subsequent criminal proceedings against the probationer arising out of the same violations for which probation was revoked. *See California v. Coleman* (Ca. 1975), 533 P.2d 1024, 1042; *McCracken v. Corey* (Alaska 1980), 612 P.2d 990; *State v. Begins* (Vt. 1986), 514 A.2d 719.

¶34 In each of the cases relied on by R.L.H., criminal charges were filed against the probationer along with the petition to revoke. Thus, the probationer was compelled to make a decision whether to testify on their own behalf at the probation revocation hearing, in an attempt to convince the court that even if they did whatever they were accused of, their probation should not be revoked, and thereby risk self-incrimination in the subsequent

10

criminal trial, or to invoke their Fifth Amendment right against self-incrimination. To alleviate this dilemma, the California Supreme Court in *Coleman* fashioned a judicial exclusionary rule whereby any incriminating testimony offered by the probationer during the probation revocation hearing would be inadmissible against the probationer during subsequent criminal proceedings on related charges, so long as the probationer made a timely objection during the probation revocation proceedings. *Coleman*, 553 P.2d at 1042.

¶35 In *Coleman* the California Supreme Court stated that the federal law was at that time in a state of confusion. *Coleman,* 553 P.2d at 1034. Since *Coleman* was decided in 1975, the United States Supreme Court decided *Minnesota v. Murphy* (1984), 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409, and this Court relied on *Murphy* in deciding *Fuller.* There is now less confusion. As stated above in ¶ 32, the right not to incriminate one's self is generally not self-executing. It must be invoked. However, there is an exception to the general rule that a defendant must invoke the privilege. That is, where the defendant is not free to admit, deny, or refuse to answer, the privilege is deemed self-executing. *Fuller,* 276 Mont. at 161, 915 P.2d at 812 (citing *Murphy*, 465 U.S. at 429, 104 S.Ct. at 1143).

¶36 In this case the State had not filed a petition seeking a separate determination that R.L.H. had committed the offense of criminal possession of dangerous drugs. The petition to revoke her probation indicates that it did not intend to do so. The State desired the admission so that it could revoke her probation and send her to treatment. Thus, R.L.H. appeared in Youth Court on January 2, 2003, and with the advice and assistance of counsel made the admissions in question only after being advised that such would be used to revoke her probation. She was further advised in the written admission form that the disposition

11

could include placement in a State Correctional Facility with restrictions on her release. In other words, she was aware that if she admitted methamphetamine use her probation would be revoked, she would be placed out of her home, and her liberty could be restricted.

¶37 R.L.H. admitted that she had used methamphetamine as a part of an agreement with the County Attorney whereby she would admit the charged offenses in exchange for a recommendation that she be placed at Shodair for treatment. The agreement contemplated that her probation would be revoked. She received the benefit of her bargain, and was placed at Shodair on probation. It was only later, after she violated the terms of her probation, that the formal petition was filed for the purpose of making a determination that she indeed committed the offense of criminal possession of dangerous drugs, which would be a felony crime if she were an adult. As noted by the Youth Court in response to her attorney's objection to the introduction of R.L.H.'s admissions into evidence:

> [T]he position you're taking, quite simply, is that your client can come before the [c]ourt and admit the allegations that have been lodged against her. Then, if the rehabilitation plan fails, that none of those admissions should be able to be used against her, even though she: A) was advised of her rights, filed an acknowledgment of those rights, which included the right to remain silent, and if she said anything, it may be used against her; and B) the waiver of those rights in which she states that she understands that by entering admissions she's waiving all of the rights that she was previously advised of on January 2nd, 2003, which included . . . her right not to incriminate herself in this or any other proceeding related to this matter.
>
> She was advised that if she testified or that if she made admissions, that she gave up her right not to incriminate herself. She was represented by counsel . . . .
>
> The simple fact is that when you admit to committing an offense, those admissions may be used against you if you've been properly informed of your rights, which [R.L.H.] was.

12

¶38    That admissions are made voluntarily is all that is required for a confession to be admissible in a Youth Court proceeding. *Matter of C.L.*, 2004 MT 71, ¶¶ 9-17, 320 Mont. 369, ¶¶ 9-17, 87 P.3d 462, ¶¶ 9-17; *see also State v. Stevens* (1921), 60 Mont. 390, 401, 199 P. 256, 259. The State did not place R.L.H. in a position where she was coerced into waiving her right to not incriminate herself by a threat to penalize her if she chose to invoke it. She was not presented with a classic penalty situation as described in *Murphy*, 465 U.S. at 426-27, 104 S.Ct. at 1141-42, (quoted in *Fuller*, 276 Mont. at 162, 915 P.2d at 813), wherein the State either expressly or by implication asserts that invocation of the privilege against self- incrimination would lead to the revocation of her probation or some other type of sanction. Even though the dissent posits otherwise, there was no coercion by the State. The State had already petitioned to revoke her probation, and the use of methamphetamine was the main allegation of why. What the State fairly offered was the carrot of a placement at Shodair if she admitted her methamphetamine use. She would have not suffered any penalty if she remained silent. The result of her silence would have been that the State was put to its proof. If the State was successful anyway, she may have lost the recommendation for a placement at Shodair. R.L.H. was required to decide whether to forego her Fifth Amendment right in exchange for the treatment recommendation. However, such was not improper and did not place her in a classic penalty situation because she would have lost nothing by invoking her privilege. R.L.H. was in a classic plea bargain situation. She gained the recommendation that she be treated at Shodair in exchange for her admission. Further, she made no objection to the later use of the admissions if she were to violate the terms of the probation.

13

¶39 Under these circumstances, the Youth Court did not err in admitting R.L.H.'s admissions into evidence and in taking judicial notice of R.L.H.'s waiver of her right against self-incrimination.

## IV. CONCLUSION

¶40 We affirm the disposition of the Youth Court finding that R.L.H. is a delinquent youth by virtue of her use of methamphetamine and committing her to the custody of the Department of Corrections for placement at Riverside Correctional Center. We reverse the Youth Court disposition finding that R.L.H. committed the offenses of possession of opiates and possession of marijuana on or about December 19, 2002.


/S/ JOHN WARNER



We Concur:

/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE




Justice Jim Rice concurring.

¶41 I concur with the Court's opinion.

¶42 We hold that a positive drug test, "standing alone," is insufficient to sustain a conviction for drug possession. We do so because, without more, a positive test result is

14

insufficient to establish the mental state which is an element of the offense. I would add, however, that "[a] person's mental state rarely can be proved by direct evidence; it usually must be inferred from the facts and circumstances about which the witnesses testify." *State v. Bay*, 2003 MT 224, ¶ 16, 317 Mont. 181, ¶ 16, 75 P.3d 1265, ¶ 16 (citing *State v. Longstreth*, 1999 MT 204, ¶ 34, 295 Mont. 457, ¶ 34, 984 P.2d 157, ¶ 34.) Various kinds of evidence may serve to provide a basis to infer one's mental state in this instance. For example, multiple positive tests were found sufficient, for revocation purposes, in *United States v. Oliver* (8th Cir. 1991), 931 F.2d 463. In *Brown v. State* (Tex. Ct. App. 1988), 760 S.W. 2d 748, the large concentration of marijuana in defendant's body was sufficient, upon expert testimony, to defeat his claim that he had passively inhaled smoke from others' use and thereby establish culpability. Although, as the Court notes, a defendant's admission of drug use may provide the basis to infer possession, other kinds of evidence, depending on its probative value, may do so also.

/S/ JIM RICE

Chief Justice Karla M. Gray joins in the foregoing concurrence of Justice Jim Rice.

/S/ KARLA M. GRAY

Justice Patricia O. Cotter dissents.

¶43     I dissent.

¶44     As the Court notes at ¶ 36, the State represented in its petition to revoke R.L.H.'s probation that it had no intention of seeking a separate determination that R.L.H. had committed the offense of criminal possession of dangerous drugs.  R.L.H. was therefore explicitly led to believe that the admissions she would make in court would be used solely as a basis for the disposition of the State's petition to revoke her probation.

¶45     As the majority also correctly notes, if the State has not compelled an individual to incriminate herself, she must invoke the privilege in order for it to attach.  *See* ¶ 32, above.  However, the majority concludes that R.L.H. was not compelled in the "classic penalty" sense and thus lost the benefit of this privilege because she failed to invoke it.  This is where we part ways.

¶46     In *Fuller*, we explained that the "classic penalty situation" is that instance in which an individual's access to the Fifth Amendment privilege against self-incrimination is foreclosed because the individual is threatened with a penalty should he or she invoke it.  *Fuller*, 276 Mont. at 162, 915 P.2d at 813 (citing *Murphy*, 465 U.S. at 434, 104 S.Ct. at 1145-46).  In the situation at hand, R.L.H. was compelled to confess to methamphetamine use because had she refused to do so, the State would have recommended that her probation be revoked and that she be incarcerated; this would mean, obviously, that she would not receive drug treatment at Shodair.  Although the majority asserts that R.L.H. knew that her admission of methamphetamine use could result in a restriction on her liberty (¶ 36), probationary placement in a treatment program at Shodair is a far cry from incarceration.  Simply put, R.L.H. was given two options:  admit and get treatment or deny and go to jail.

16

¶47   The majority further asserts that R.L.H. was advised that the disposition of her Juvenile Admission and Waiver of Rights could include placement in a State Correctional Facility. *See* ¶ 36, above. This is true *for the disposition of the petition to revoke on the conviction R.L.H. already faced.* The Admission and Waiver states that, among other things, the disposition may include counseling, community service, probation, placement with the Department of Corrections, and other serious consequences. What the Admission and Waiver does *not* say is that additional charges could be filed against R.L.H. as a result of her admission.

¶48   In *Fuller*, 276 Mont. at 162, 915 P.2d 813 (quoting *Murphy*, 465 U.S. at 434, 104 S.Ct. at 1146), we explained, "A State may require a probationer to appear and discuss matters that affect his probationary status; such a requirement, without more, does not give rise to a self-executing privilege. *The result may be different if the question put to the probationer, however relevant to his probationary status, calls for answers that would incriminate him in a pending or later criminal proceeding.*" (Emphasis added.) This is precisely the situation before us. Questions put to probationer R.L.H. indeed incriminated her in a later criminal proceeding. Furthermore, R.L.H. was never advised that her statement could be used to support subsequent criminal proceedings against her should she violate the terms of her continued probation. *See* ¶ 32, above.

¶49   A command to speak, under threat of loss of liberty, implicitly forecloses the option of remaining silent. *Fuller*, 276 Mont. at 163, 915 P.2d at 814. In *Fuller*, the defendant was ordered to continue his participation in a sex offender treatment program--to include the disclosure of his offense history--or face probation revocation and incarceration. *Fuller*, 276

17

Mont. at 162, 915 P.2d at 813. The self-incriminatory evidence Fuller then divulged caused him to be subsequently charged with and convicted of three additional crimes. *Fuller*, 276 Mont. at 163, 915 P.2d at 814. In the situation before us, R.L.H. was ordered to divulge her methamphetamine use in order to get drug treatment at Shodair, or face probation revocation and incarceration. The self-incriminatory evidence she then divulged caused her to be subsequently charged with and convicted of a crime. In *Fuller*, we concluded that if the State chooses to compel answers to incriminating questions, it cannot use those answers against the defendant in a later criminal proceeding. *Fuller*, 276 Mont. at 167, 915 P.2d at 816. The same result is compelled here.

¶50    Finally, it is troubling to me that we find it of no consequence that the State made a representation to R.L.H. that it failed to honor. The State made an affirmative representation during the revocation proceedings that it would *not* seek a separate determination that she had committed the offense of criminal possession of dangerous drugs. True, R.L.H. absconded. Nonetheless, it seems to me that if the State wishes to reserve the right to use a defendant's incriminating statement against her should she violate the probation conditions, the State should make this clear on the record *before* the admissions are made. A properly informed defendant can then either decline to make the admission and suffer the consequences, or proceed with the full knowledge that should she fail to comply with the terms of probation, her statements may and likely will be used against her to support independent felony charges at a later time. In this respect, I agree with the decision of the California Supreme Court in *Coleman*, 533 P.2d 1024.

18

¶51    For the foregoing reasons, I dissent from the majority's conclusion that R.L.H.'s incriminating statements were properly admitted as evidence at trial.


/S/ PATRICIA O. COTTER