JUSTICE HUNT
delivered the Opinion of the Court.
Appellant Matthew C. Fuller (Fuller) was charged in the Thirteenth Judicial District Court, Yellowstone County, with rape and sexual assault. Fuller moved to dismiss the charges, alleging that the State violated his constitutionally guaranteed privilege against compelled self-incrimination. After the District Court denied his motion, Fuller pled guilty to the charges. Fuller appeals the District Court’s denial of his motion to dismiss. We reverse.
ISSUE
Fuller raises two issues on appeal:
*158 1. Did the District Court err in refusing to grant Fuller’s motion to dismiss because the State impermissibly violated his constitutionally guaranteed privilege against compelled self-incrimination?
2. Did the District Court err in refusing to grant Fuller’s motion to dismiss because his conviction offended the “fundamental fairness” doctrine set out in State v. Theil (1989), 263 Mont. 63, 768 P.2d 343?
Due to the resolution of the first issue, we do not find it necessary to address the second.
FACTS
The parties stipulated to the facts in this case.
On December 9, 1992, Fuller was charged with three counts of attempted sexual assault. After a bench trial, the District Court found Fuller guilty of all three counts. The District Court suspended Fuller’s sentence but required, among other things, that he “obtain and/or continue his enrollment and participation in [an] outpatient Sex Offender Treatment Program” and “follow all policies of that program.” In September 1994, this Court reversed the attempt convictions for lack of evidence, and ordered Fuller to be acquitted of the charges. See State v. Fuller (1994), 266 Mont. 420, 880 P.2d 1340.
After his 1992 conviction but prior to the 1994 reversal, Fuller was accepted into a treatment program in Billings. Patients are not admitted into the treatment program if they are in denial or do not honestly disclose their offense history. Further, patients will be terminated from the program if dishonesty or denial occur during their treatment, if they re-offend during treatment, or if they otherwise break the rules of the treatment program.
The employees of the treatment center are required to report to the authorities any evidence they possess about past or present offenses committed by individuals in the treatment program. Offenders who enter the treatment program are required to fully disclose their offense histories.
During treatment, Fuller prepared and presented to his treatment group an offense history which disclosed several past offenses, including the three at issue here, each of which involved a different prepubescent girl. On March 30, 1994, the treatment program contacted the Probation and Parole Department (the Department) to notify it that Fuller had violated treatment policies. In accordance with its statutory duty, the treatment program also informed the Department of the three prior offenses Fuller had revealed during treatment. The *159 Department in turn notified the Billings Police Department. Fuller subsequently was arrested for unrelated violations of probation.
On April 14,1994, the State petitioned the District Court to revoke Fuller’s suspended sentence. The grounds for revocation did not include the charges which are the basis of the instant appeal. The District Court revoked the suspended sentence and remanded Fuller to the custody of the Montana State Prison.
Meanwhile, the Billings Police Department investigated the incidents Fuller had revealed in treatment and took statements. No investigation had occurred prior to the police department receiving the information obtained from the treatment center. On the basis of the police investigation, Fuller was charged with one count of sexual intercourse without consent and two counts of sexual assault. He moved to dismiss the charges, alleging that the State’s actions violated his constitutional privilege against compelled self-incrimination. The District Court denied the motion. Fuller then pled guilty to the charges, but specifically reserved his right to appeal the denial of his motion. It is that appeal which we decide today.
STANDARD OF REVIEW
The grant or denial of a motion to dismiss is within the sound discretion of the trial court and will not be disturbed unless an abuse of that discretion is shown. State v. Barker (1993), 260 Mont. 85, 89, 858 P.2d 360, 362-63 (citing State v. Laster (1986), 223 Mont. 152, 724 P.2d 721).
Whether or not a defendant’s privilege against compelled self-incrimination is triggered is a conclusion of law. “Our standard of review of a district court’s conclusions of law is plenary. We determine whether the district court’s conclusions are correct.” State v. Sage (1992), 255 Mont. 227, 229, 841 P.2d 1142, 1143 (citing Steer, Inc. v. Dept. of Revenue (1990), 245 Mont. 470, 803 P.2d 601).
Fuller alleges that his privilege against compelled self-incrimination was violated. This right is guaranteed to all citizens under both the Montana Constitution and the Fifth Amendment to the United States Constitution. Accordingly, the resolution of Fuller’s appeal will rest on Article II, Section 25 of the Montana Constitution, as well as the United States Supreme Court’s interpretation of the Fifth Amendment.
DISCUSSION
Did the District Court err in refusing to grant Fuller’s motion to dismiss because the State impermissibly violated his constitutionally guaranteed privilege against compelled self-incrimination?
*160 Montana residents are protected from compelled self-incrimination under both the Montana and the United States Constitutions. Article II, Section 25 of the Montana Constitution provides that “no person shall be compelled to testify against himself in [a] criminal proceeding.” The Fifth Amendment to the United States Constitution similarly provides that no person “shall be compelled in any criminal case to be a witness against himself.”
All citizens enjoy this constitutional protection, regardless of who they are or how they are situated. It extends beyond trial or custodial situations, because “the [Fifth Amendment] privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites.” Estelle v. Smith (1981), 451 U.S. 454, 462, 101 S.Ct. 1866, 1873, 68 L.Ed.2d 359 (quoting In re Gault (1967), 387 U.S. 1, 49, 87 S.Ct. 1428, 1455, 18 L.Ed.2d 527). Accordingly, the privilege extends to those already convicted of a crime. Minnesota v. Murphy (1984), 465 U.S. 420, 426, 104 S.Ct. 1136, 1141-42, 79 L.Ed.2d 409 (citing Baxter v. Palmigiano (1976), 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810).
The language of the Fifth Amendment speaks of “compulsion.” Therefore, if the State has not compelled the defendant to respond, the Fifth Amendment privilege does not attach. “[A] general obligation to appear and answer questions truthfully [does] not convert otherwise voluntary statements into compelled ones.” Murphy, 465 U.S. at 427, 104 S.Ct. at 1142.
A person claiming the protection of the Fifth Amendment generally must affirmatively invoke it. United States v. Monia (1943), 317 U.S. 424, 427, 63 S.Ct. 409, 410-11, 87 L.Ed.2d 376. This duty to claim the privilege remains with the individual even when the government is unquestionably attempting to compel a response. “[I]f a witness under compulsion to [answer] makes disclosures instead of claiming the privilege, the government has not ‘compelled’ him to incriminate himself.” Garner v. United States (1976), 424 U.S. 648, 654, 96 S.Ct. 1178, 1182, 47 L.Ed.2d 370. Moreover, a defendant’s ignorance of his Fifth Amendment rights generally will not excuse his failure to claim the privilege. An individual may lose the benefit of the privilege without making a knowing and intelligent waiver; if he simply fails to assert the privilege, it will be deemed waived. Garner, 424 U.S. at 654, 96 S.Ct. at 1182; Maness v. Meyers (1975), 419 U.S. 449. 466. 95 S.Ct. 584, 595, 42 L.Ed.2d 574.
*161 In this case, Fuller never asserted his Fifth Amendment privilege, or, pursuant to it, refused to answer. Instead, he fully and honestly answered the questions put to him by the treatment program, in accordance with the District Court’s order. If our inquiry ended here, Fuller would be precluded from assigning error to the District Court’s denial of his motion to dismiss.
There is an exception, however, to the general rule that a defendant must affirmatively invoke the privilege in order to enjoy its protections. Failure to invoke the privilege does not preclude the benefit if the defendant is placed in a situation where he is not “free to admit, deny, or refuse to answer.” Murphy, 465 U.S. at 429, 104 S.Ct. at 1143 (citing Garner, 424 U.S. at 657, 96 S.Ct. at 1183). In such cases, a defendant’s privilege against self-incriminating is said to be “self-executing.” The United States Supreme Court has applied this exception to three different types of cases.
First, the Supreme Court has held that gamblers may exercise their Fifth Amendment privilege against self-incrimination by refusing to file a federal income tax return. “In recognition of the pervasive criminal regulation of gambling activities and the fact that claiming the privilege in lieu of filing a return would tend to incriminate, the [Supreme] Court has held that the privilege may be exercised by failing to file.” Murphy, 465 U.S. at 439, 104 S.Ct. at 1148 (citing: Marchetti v. United States (1968), 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889; Grosso v. United States (1968), 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906; Mackey v. United States (1971), 401 U.S. 667, 91 S.Ct. 1160, 28 L.Ed.2d 404).
Second, the Supreme Court has held that an individual subject to a custodial interrogation must be formally advised of his Fifth Amendment right to remain silent. Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. The Supreme Court reasoned that a government agency conducting such an interrogation is aware that the responses elicited are likely to be incriminatory. Further, the isolation and intimidating atmosphere inherently found in police custody, whether intentional or not, might undermine the individual’s will and compel him to speak when he would otherwise be silent. Murphy, 465 U.S. at 430, 104 S.Ct. at 1143-44. Therefore, the Supreme Court has placed upon the government the affirmative duty to inform a suspect of his right to remain silent before questioning him. Miranda, 384 U.S. at 498, 86 S.Ct. at 1640. However, “this extraordinary safeguard does not apply outside the context of the inherently coercive custodial interrogations for which it was designed.” Murphy, *162 465 U.S. at 430, 104 S.Ct. at 1144 (quoting Roberts v. United States (1980) 445 U.S. 552, 560, 100 S.Ct. 1358, 1364, 63 L.Ed.2d 622).
Third, the Supreme Court has held that an individual need not formally invoke the privilege if the government prevents a voluntary invocation of the Fifth Amendment by threatening to penalize the individual should he or she invoke it. Murphy, 465 U.S. at 434, 104 S.Ct. at 1145-46 (citing Garner, 424 U.S. at 661, 96 S.Ct. at 1186). This foreclosure of access to the Fifth Amendment is termed a “classic penalty situation.” In Murphy, the Supreme Court further explained the classic penalty situation:
The threat of punishment for reliance on the privilege distinguishes cases of the sort from the ordinary case in which a witness is merely required to appear and give testimony. A State may require a probationer to appear and discuss matters that affect his probationary status; such a requirement, without more, does not give rise to a self-executing privilege. The result may be different if the question put to the probationer, however relevant to his probationary status, calls for answers that would incriminate him in a pending or later criminal prosecution. There is thus a substantial basis in our cases for concluding that if the State, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer’s answers would be deemed compelled and inadmissible in a criminal prosecution.
Murphy, 465 U.S. at 435, 104 S.Ct. at 1146, (fn. omitted, emphasis added).
Fuller claims the State placed him in a classic penalty situation. He consequently asserts that his failure to invoke the Fifth Amendment should be excused, and that the State is prohibited from using any disclosure made in treatment in a subsequent prosecution. We therefore must evaluate whether the requirements demanded of Fuller by the District Court placed him in a classic penalty situation.
The District Court ordered Fuller to “obtain and/or continue his enrollment and participation in the outpatient Sex Offender Treatment Program ... [and to] follow all policies of that program ...” If he failed to comply, his probation would be revoked and he would be sent to prison. The policies of the treatment program required that he fully and honestly disclose his offense history. Again, if he failed to do so, his probation would be revoked and he would be sent to prison. It is *163 therefore undisputed that the State compelled Fuller to divulge past activities which it knew would be criminal.
It is further undisputed that the information divulged by Fuller was self-incriminatory. On the basis of the offense history disclosed, and on that basis alone, Fuller was charged and convicted of three additional crimes.
The State insists these circumstances did not rise to the level of a classic penalty situation because the District Court never threatened to punish Fuller for exercising his Fifth Amendment right. At any time, the State argues, Fuller could have invoked his privilege against self-incrimination. Had he done so, the State further argues, the District Court could not have lawfully punished him for its invocation and his consequent refusal to speak.
While Fuller acknowledges that the District Court never expressly threatened to punish him for relying on the Fifth Amendment, he argues that such a threat was implicit in its insistence that he speak or be punished. We agree. A command to speak, under threat of loss of liberty, implicitly forecloses the option of remaining silent.
We are therefore unable to imagine how the dissent can assert that the record does not support Fuller’s position. The facts in this case are not in dispute; on the contrary, the parties stipulated to them, as we pointed out earlier in this opinion. In the stipulated facts, both parties conceded this issue and that portion of the stipulation is set out verbatim:
[The District Court] signed a judgment and commitment order sentencing Fuller to ten years on each count to run concurrently. The execution of the sentence was suspended upon the performance by Fuller of certain conditions, [one] of which [was] the following: the defendant shall obtain and/or continue his enrollment and participation in the out-patient sex offender treatment program with a professional who is in compliance with the standards for treatment...
After Fuller was first sentenced in January, 1994, he entered sexual offender treatment... prior to sentencing, a sexual offender evaluation was ordered by the District Court. Fuller was accepted into treatment prior to imposition of sentence.
Patients are not admitted into a treatment program if they are in denial or do not honestly disclose their offending history. Further, patients will be terminated from the program, if the same occurs *164 during their treatment, they reoffend during treatment, or otherwise break the rules of the treatment programs. [Emphasis added.]
The District Court threatened to send Fuller to prison if he did not honestly disclose his offense history. It therefore threatened a real and significant punishment if he remained silent. The State explains that this threat only applied to unexplained silence, not to silence maintained pursuant to the Fifth Amendment. But it is too fine a distinction to expect an individual to differentiate between exercising a constitutional right to remain silent and merely remaining silent. The threat of punishment implicitly extended to both.
This decision is supported by the United Stated Supreme Court’s interpretation of the Fifth Amendment as articulated in Murphy, even though the Supreme Court reached the opposite conclusion in that case. In Murphy the defendant’s probation required, among other things, that he participate in a sex offender treatment program, that he report periodically to his probation officer, and that he “be truthful with the probation officer in all matters.” Murphy, 465 U.S. at 422, 104 S.Ct. at 1139. After Murphy left the treatment program, a counselor called his probation officer and informed her that, while in treatment, Murphy had confessed to a rape and murder committed years earlier. When the probation officer confronted Murphy with the information obtained from the treatment counselor, he again confessed to the rape and murder. The probation officer forwarded the information to the police and Murphy was subsequently tried and convicted of the murder. Murphy, 465 U.S. at 422-25, 104 S.Ct. at 1139-41.
The Supreme Court found that Murphy had not claimed his Fifth Amendment privilege, and that his was not one of the three exceptional situations where the privilege is self-executing. Specifically, the Supreme Court found that Murphy was not placed in a classic penalty situation because the Minnesota probation revocation statute did not impermissibly foreclose a free choice to be silent. Murphy, 465 U.S. at 437, 104 S.Ct. at 1147-48. It therefore concluded that Murphy’s Fifth Amendment privilege was not self-executing and, since he had not invoked it, that it was properly deemed to have been waived.
Factually, the case at bar is far different. In Murphy, “[t]he state court did not attempt to define the precise contours of Murphy’s obligation to respond to questions. Murphy’s probation condition proscribed only false statements; it said nothing about his freedom to decline to answer particular questions ...” Murphy, 465 U.S. at 437, 104 S.Ct. at 1147. In the case at bar, Fuller’s obligation was *165 clearly and precisely set out. He was required to disclose his offense history in order to maintain his place in the treatment program and avoid being sent to prison. Fuller was directly ordered to incriminate himself; this is a condition far removed from the general obligation to be truthful that constrained Murphy. Simply put, the State gave Fuller two choices: disclose, or go to prison.
The Supreme Court particularly acknowledged in Murphy that a proper Fifth Amendment analysis might lead to an opposite conclusion — that is, to a holding that the Fifth Amendment was in fact violated — if the defendant faced specifically incriminating questions rather than just a general obligation to be truthful. As we have already noted, the Supreme Court in Murphy held that “[t]he result may be different if the question put to the probationer, however relevant to his probationary status, calls for answers that would incriminate him in a pending or later criminal prosecution.” Murphy, 465 U.S. at 435, 104 S.Ct. at 1146. This is precisely what happened in this case, and precisely why we properly reach a conclusion opposite to that reached by the Supreme Court in Murphy.
The State points out, however, that in reality the District Court could not have revoked Fuller’s probation for refusing to disclose his offense history, because this Court has found that it is unconstitutional to revoke probation for failure to admit to a criminal act. See State v. Imlay (1991), 249 Mont. 82, 813 P.2d 979, cert. granted, 503 U.S. 905, 112 S.Ct. 1260, 117 L.Ed.2d 489 cert. dismissed 506 U.S. 5, 113 S.Ct. 444,121 L.Ed.2d 310 (1992). It therefore contends that there was no real prospect of sanctions if Fuller remained silent, despite Fuller’s argument to the contrary. The dissent also devotes much energy to arguing that Fuller’s interpretation of Imlay is incorrect.
The District Court threatened to revoke Fuller’s probation if he did not remain in the treatment program and follow its policies, including disclosing his offense history. Fuller argued that the district court retained its power to carry out this threat, even in the face of the Imlay decision. The State contended, and the dissent agrees, that Imlay stands for the proposition that a district court does not have the ability to carry out such a threat.
On this point, the majority and dissent do not disagree. The holding in Imlay stands for the proposition that probation cannot be revoked solely on the ground that the defendant refuses to admit that he or she is guilty of a crime. Therefore, the dissent’s claim, that Fuller’s reading of Imlay is incorrect, may well have some merit.
*166 We do not minimize the potential importance of the Imlay decision in other cases; however, in this case, the holding in Imlay is largely irrelevant. The dissent emphasizes that the District Court, pursuant to Imlay, lacked the actual ability to carry out its threatened revocation of Fuller’s probation if he chose to remain silent. But whether the District Court actually could have carried out its threat is beside the point. It is the issuance itself of a credible threat which is crucial. The District Court, presumably knowing that it could not revoke Fuller’s probation if he refused to admit to past crimes (and such admissions are certainly what the phrase “offense history” contemplates), nevertheless threatened to do exactly that. Fuller cannot be faulted for taking the District Court at its word and acting accordingly.
Moreover, the reliance by the State and the dissent on the Imlay decision ignores the realities of Fuller’s situation. He was under a court order to comply with the policies of the treatment program; he was told that if he failed to do so, his probation would be revoked. He believed the District Court had the authority and the ability to carry out its threat, and that belief was eminently reasonable. It is far less reasonable to expect him to know that the threat was an empty one.
The State next argues that this entire situation would never have arisen if Fuller had been honest with the State in plea negotiations, revealing the three previous crimes to the State or to the District Court at an earlier date. If Fuller had disclosed the offenses earlier, however, presumably the State would have prosecuted him earlier. It has never been incumbent upon a defendant to assist the State in his own prosecution. Fuller’s failure to do so is not relevant to the question of whether his Fifth Amendment privilege was violated.
Nor do we find Fuller’s lack of knowledge of the particularities of this area of law to be “ludicrous,” as the dissent apparently does. Considering that the learned members of the United States Supreme Court, the learned members of this Court, and a myriad of legal scholars cannot agree on the exact parameters of an individual’s privilege against compelled self-incrimination, it would be ludicrous to expect a lay-person defendant to appreciate its intricacies. Every schoolchild may be familiar with the Fifth Amendment as a concept, as the dissent claims. That does not, however, translate to a widely-held understanding of its every nuance and subtlety.
Following the analysis set out in Murphy, the proper inquiry is “whether [a defendant’s] probation conditions merely required him to appear and give testimony about matters relevant to his probationary status or whether they went further and required him to choose *167 between making incriminating statements and jeopardizing Ms conditional liberty by remaining silent.” Murphy, 465 U.S. at 436, 104 S.Ct. at 1147. TMs latter “required choice” is precisely and solely what the State offered in Fuller’s case. This is “the extra, impermissible step” which serves to make the Fifth Amendment privilege self-executing. Murphy, 465 U.S. at 436, 104 S.Ct. at 1147.
Because the State improperly compelled Fuller to disclose past criminal acts in violation of his Fifth Amendment privilege against compelled self-incrimination and Ms constitutionally guaranteed right to remain silent, it is prohibited from using any of the information elicited as the basis for a later, separate criminal prosecution. Therefore, the District Court erred in denying Fuller’s motion to dismiss on these grounds. While we have devoted considerable time to a lengthy discussion of the application of the Fifth Amendment to the United States Constitution, it is to be noted that this holding is also based separately and independently on Fuller’s right to remain silent pursuant to Article II, Section 25 of the Montana Constitution.
We emphasize that tMs holding does not stand for the proposition that the State may not compel a defendant to answer. It can; indeed, in order for treatment to be effective, it must, because a defendant who refuses to disclose Ms offense Mstory cannot be successfully treated. However, if the State chooses to compel answers to incriimnatmg questions, it cannot use those answers agamst the defendant in a later criminal proceedmg.
Judgment reversed.
JUSTICE LEAPHART concurs.